**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| CELSIUS NETWORK LLC, *et al.,* | Case No. 22-10964 (MG) |
| Post-Effective Date Debtors. | Chapter 11 |

| | |
|---|---|
| MOHSIN Y. MEGHJI, LITIGATION ADMINISTRATOR, AS REPRESENTATIVE FOR THE POST-EFFECTIVE DATE DEBTORS | |
| Plaintiff, | Adv. Pro. No. 24-03988 (MG) |
| v. | |
| EMIL BAILEY | |
| Defendant. | |

| |
|---|
| EMIL BAILEY |
| Counter-Plaintiff, |
| v. |
| MOHSIN Y. MEGHJI, LITIGATION ADMINISTRATOR, AS REPRESENTATIVE FOR THE POST-EFFECTIVE DATE DEBTORS |
| Counter-Defendant. |

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS**

*A P P E A R A N C E S:*

AKIN GUMP STRAUSS HAUER & FELD LLP
*Counsel for Mohsin Y. Meghji, Litigation Administrator for Celsius Network LLC and its
Affiliated Debtors*
One Bryant Park
New York, New York 10036
By:     Mitchell P. Hurley, Esq.
        Dean L. Chapman Jr., Esq.

2300 N. Field Street
Suite 1800
Dallas, Texas 75201
By:     Elizabeth D. Scott, Esq.
        Nicholas R. Lombardi, Esq.

EMIL BAILEY
*Pro Se Individual[1]*

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the contested motion (the "Motion," ECF Doc. # 20) of

plaintiff Mohsin Y. Meghji in his capacity as Litigation Administrator (the "Litigation

Administrator" or "Plaintiff") for Celsius Network LLC and its affiliated debtors (collectively,

"Celsius" or the "Post-Effective Date Debtors") pursuant to the *Modified Joint Chapter 11 Plan*

*of Reorganization of Celsius Network LLC and its Debtor Affiliates (Conformed for MiningCo*

*Transaction)* (the "Plan," ECF Doc. # 4289).[2]  The Motion seeks entry of an order dismissing,

with prejudice, the counterclaims (each, a "Counterclaim" and collectively, the "Counterclaims")

of defendant Emil Bailey ("Bailey" or "Defendant") asserted in *Defendant Emil Bailey's*

---

[1]     Janice B. Grubin and Ilan Markus of Barclay Damon LLP ("Barclay") previously represented the
Defendant in this adversary proceeding, filing the Answer and Opposition on his behalf.  On May 2, 2025, however,
the Court entered an order (ECF Doc. # 35) granting Barclay's motion to withdraw as counsel to the Defendant
(ECF Doc. # 32).  Accordingly, the Defendant is now appearing *pro se*.

[2]     References to ECF docket numbers shall refer to those in the adversary proceeding unless otherwise
specified.  Additionally, defined terms used but not defined herein shall have the meanings ascribed to them in the
Plan.

*Amended Answer, Affirmative Defenses, and Counterclaims to the Plaintiff's Adversary Complaint* (the "Amended Answer," ECF Doc. # 16) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding pursuant to Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.  The Amended Answer was filed in response to the adversary complaint (the "Complaint," ECF Doc. # 1) that seeks, among other things, to avoid certain alleged fraudulent transfers made by Jason Stone (the "Executive"), the former Chief Executive Officer of Post-Effective Date Debtor Celsius KeyFi LLC ("Celsius KeyFi"), and KeyFi, Inc. ("KeyFi"), the Executive's majority-owned vehicle (the "Vehicle").  (*See* Complaint ¶ 1.)

Bailey filed an opposition to the Motion (the "Opposition," ECF Doc. # 25) to which the Litigation Administrator filed a reply (the "Reply," ECF Doc. # 30).

For the reasons discussed below, the Court **GRANTS** the Motion and **DISMISSES** the Counterclaims with prejudice.  The Defendant's request for leave to amend the Counterclaims is also **DENIED**.

## I.    BACKGROUND

### A.  Relevant Background[3]

The Defendant asserts the Counterclaims as part of an effort to recover certain profits allegedly owed to him in connection with his loan of certain cryptocurrency (the "Crypto Assets") described in greater detail below.  (Amended Answer ¶¶ 86–88.)  The Crypto Assets

---

[3]    The facts underlying this Opinion are derived from the Amended Answer in connection with the Counterclaims, the well-pleaded allegations of which are taken as true for purposes of addressing the Motion, as well as documents incorporated by reference.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."); *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (stating that, in considering a motion to dismiss, a court may consider "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint" (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010))).

were held in two wallets, both of which the Defendant maintains it was the lawful owner at all

relevant times: (i) Wallet 0x2c715f1ab0f31c6a28bc356ef107940d06d5ff2b that held 850

Ethereum (ETH) (the "ETH Wallet"), and (ii) Wallet 1E4BN4e2LtEsqJBmzvGJsBmGVuaKcg

ZQZ that held approximately 19 Bitcoin (BTC) (the "BTC Wallet").  (*Id.* ¶¶ 87–88, 90.)

1.  The Agreement to Loan Cryptocurrency

On or around March 7, 2020, the Executive contacted the Defendant seeking to borrow

the Crypto Assets to assist in demonstrating, as a "proof of concept," the lucrative nature of his

decentralized finance investment strategies.  (*Id.* ¶¶ 90–91.)  These strategies include staking,

folding, and collateralizing cryptocurrency as well as minting, trading, and otherwise deriving

profits from non-fungible tokens.  (*Id.* ¶ 90.)

Ultimately, on or about September 17, 2020, the Defendant agreed to lend and

temporarily allow the Executive and/or the Vehicle to use the Crypto Assets in exchange for the

Executive's agreement to return all the Crypto Assets to the Defendant plus any profits

generated.  (*Id.* ¶ 95.)  In addition, the Executive further agreed to only charge a fee once certain

return thresholds were satisfied and would provide the Defendant with periodic accounting

statements.  (*Id.*)  The "essential terms" of this agreement (the "Agreement"), the Defendant

indicates, were memorialized by the parties through various electronic communications."  (*Id.* ¶

96; *see also id.* ¶ 120 (alleging that the Defendant entered into a "valid, binding contract" with

the Vehicle and the Executive in addition to "written communications via email and text" that

outlined and/or confirmed the terms and distribution of profits and fees to be charged "upon

certain profit return hurdle rates being met").)  He makes clear that only temporary custody over

the ETH and BTC Wallets and Crypto Assets was granted; there was no transfer of ownership

(or right or ability to transfer ownership) conferred to anyone.  (*Id.* ¶ 97.)  The Executive and the

Vehicle, through the Executive, were permitted to "deploy [the Crypto Assets] for various

4

decentralized finance strategies for [the Defendant's] and [the] Executive/Vehicle's benefit."

(*Id.* ¶ 98.)

In accordance with the foregoing, the Defendant states that he transferred, among other

things, (i) 849.22826449 ETH from the ETH Wallet to Wallet 0x40c839B831C90173dC7fBC

e49A25274a4688ddD9, a wallet known to be in the possession, custody, or control of the

Executive and/or the Vehicle, and (ii) approximately 19 BTC to a Vehicle-controlled wallet.  (*Id.*

¶¶ 99–100.)

### 2.    The Formation of Celsius KeyFi and the Acquisition of the Vehicle

On or around October 1, 2020, Celsius Network Limited ("CNL"), the Vehicle, and the

Executive signed a memorandum of understanding that provided for the formation of Celsius

KeyFi as a subsidiary of CNL and for CNL to purchase all the Vehicle's assets.  (*Id.* ¶ 102.)  On

December 31, 2020, CNL and Celsius KeyFi's acquisition of the Vehicle pursuant to an asset

purchase agreement (the "APA") closed.[4]  (*Id.* ¶ 110.)  The parties to the APA were KeyFi as

seller and CNL and Celsius KeyFi as buyers.  (*See* APA at 1.)  The Executive continued in his

capacity as an executive with CNL and its related entities and as the Chief Executive Officer of

Celsius KeyFi.  (Amended Answer ¶ 111.)

### 3.    The Return of the Crypto Assets and the Alleged Failure to Pay Profits

In November 2020, the Defendant contacted the Executive to request the return of the

Crypto Assets plus any profits earned from their use during the period they were on loan to the

---

[4]      A copy of the APA is annexed as an exhibit to a motion to dismiss filed in a separate adversary proceeding
against the Executive (the "Stone Adversary Proceeding"), an adversary proceeding that has since settled.  (*See* Adv.
Pro. No. 22-01139, ECF Doc. # 7-3, Ex. A (copy of the APA); Adv. Pro. No. 22-01139, ECF Doc. # 145 (redacted
copy of the settlement agreement between CNL, Celsius KeyFi, Jason Stone, and KeyFi that settled, among other
things, all claims in the Stone Adversary Proceeding).)

Executive and/or the Vehicle.[5]  (*Id.* ¶ 103.)  The Executive initially declined, and the Defendant

made repeated subsequent requests.  (*Id.* ¶¶ 104–06.)  Ultimately, the Executive and/or Vehicle

agreed to return the Crypto Assets, transferring 850 ETH and 18.99 BTC to the ETH and BTC

Wallets on December 31, 2020, respectively, and only a "*de minimis* amount" of profits

generated through use of the Crypto Assets.  (*Id.* ¶¶ 108–09, 117 (indicating, among other things,

that the transfers of ETH and BTC were both completed on December 31, 2020, at 9:15 p.m. and

11:01 p.m., respectively).)

The Defendant believes that the Executive and the Vehicle generated profits of more than

$5 million that were "directly traceable to the deployment and use" of the Crypto Assets between

September 17, 2020 and December 31, 2020, as well as the "continued deployment of profits

generated therefrom" through 2024.[6]  (*Id.* ¶ 114.)  He further alleges that the Executive on behalf

of Celsius materially mispresented the profitability of the investments, falsely stating that only

minimal profits were earned and negligible distributions were made.  (*Id.* ¶ 116.)

In addition, the Amended Answer notes that, upon filing for bankruptcy on July 13, 2022

(the "Petition Date"), Celsius did not list the Defendant as a creditor or otherwise in its

schedules, and the Defendant maintains that Celsius failed to provide him with notice of its

bankruptcy case.  (*Id.* ¶ 118.)  The Litigation Administrator does not dispute this.  (*See, e.g.*,

Reply at 7 (arguing that the Defendant was not a known creditor entitled to actual notice).)

### B.  The Counterclaims

The Defendant asserts two Counterclaims, both of which are subject to the Motion and

pertain to the Agreement.  The first Counterclaim ("Count I") asserts a claim for breach of

---

[5]      The Defendant also alleges that none of the promised accounting had been provided to the Defendant.
(Amended Answer ¶ 103.)

[6]      The Defendant believes that this figure will increase at the conclusion of discovery.  (*See id.* ¶ 114.)

contract in connection with the Agreement and alleges at least $5 million in damages. (Amended Answer ¶¶ 119–126.) The Defendant maintains that he has fully performed under the Agreement but, to date, has only received a "*de minimus*" portion of the more than $5 million in profits generated from the Executive and the Vehicle's deployment of the Crypto Assets. (*Id.* ¶¶ 123–24.) This, he argues, constitutes a material breach. (*Id.* ¶ 125.)

The second Counterclaim ("Count II") asserts a claim for unjust enrichment, alleging that the Executive, the Vehicle, and, through the Vehicle, Celsius KeyFi were enriched at the Defendant's expense through the use of the Crypto Assets. (*Id.* ¶¶ 127–131.) At the same time, the Defendant argues he was deprived use of the Crypto Assets, including the realization of any gains, and it would be against both equity and good conscience to permit the Executive and Vehicle to retain any benefits bestowed. (*Id.* ¶ 130, 132.)

Accordingly, the Defendant seeks an award of damages in an amount no less than the "entire amount of returns" generated by the Executive and/or the Vehicle and directly traceable to the Crypto Assets. (*Id.* at 20.) In addition, the Defendant further seeks a declaration that the transfers of 850 ETH and 18.99 BTC to the ETH and BTC Wallets, respectively, constitute returns of the Defendant's property or, in the alternative, were made for reasonably equivalent value. (*Id.* at 21.)

### C. The Motion

The Motion seeks dismissal of the Counterclaims, as an initial matter, on grounds that the claims were discharged pursuant to section 1141(d)(1) of the Bankruptcy Code and the Court's confirmation of the Plan. (Motion at 3.) Moreover, the Litigation Administrator maintains that the Counterclaims are also barred because the Defendant did not file a proof of claim by February 9, 2023 (the "Bar Date"), the bar date for these chapter 11 cases. (*Id.* at 3–4.) Thus, dismissal with prejudice, the Litigation Administrator argues, is appropriate as it would be

7

"futile" for the Defendant to even attempt to replead the Counterclaims in light of the foregoing. (*Id.* at 5.)

Moreover, irrespective of whether the Counterclaims are barred, the Litigation Administrator also believes that the Defendant has failed to state claims upon which relief can be granted. With respect to Count I, the Litigation Administrator argues that the Defendant has not stated a claim for breach of contract because there was no allegation that Celsius KeyFi, CNL, or any Post-Effective Date Debtor was a party to the Agreement, assumed the Agreement, or expressed an intent to be bound by its terms. (*Id.* at 6.) As for Count II, the Defendant, the Litigation Administrator argues, has not specified the manner and extent to which Celsius KeyFi or any other Post-Effective Date Debtor were allegedly enriched. (*Id.* at 7.)

### D. The Opposition and Request for Leave to Amend Counterclaims

The Defendant opposes the dismissal of the Counterclaims. As an initial matter, he argues that the confirmed Plan does not bar the Counterclaims because he was a "known" creditor who was entitled to actual notice of the chapter 11 case and the Bar Date. (Opposition at 5.) Therefore, "constructive" notice through publication alone was insufficient. (*Id.*) In support, the Defendant asserts that the Executive's knowledge of the Agreement and the Defendant's requests for the return of the Crypto Assets along with profits generated can be imputed to Celsius since (i) Celsius, comprised of corporate entities, could only act through its officers and agents; (ii) the Executive was acting as an agent, executive, and officer of Celsius; (iii) the Defendant's requests for the Crypto Assets and any profits were made while the Executive was an executive and agent of Celsius; and (iv) New York law provides that an agent's knowledge can be imputed to its principal. (*Id.* at 7.) Therefore, as a known creditor, the Defendant maintains he was entitled to actual, written notice of the Bar Date, which he did not receive, and the Counterclaims are, therefore, not barred by the Plan or the Bar Date. (*Id.*)

8

Irrespective of the Executive's knowledge, the Defendant further argues that a reasonably diligent review of Celsius's books and records would have made the Defendant's potential claims known to Celsius. (*Id.* at 9 (alleging further that Celsius "deliberately . . . avoid[ed] performing diligence that would alert it to further claims such as [the Defendant's]" and its efforts in "identifying known creditors was insufficient"); *id.* at 10 (suggesting also that Celsius must have performed "some level of due diligence about the assets it was purchasing before it closed on the APA with [the Executive]").) Defendant believes that if Celsius was able to ascertain what avoidance and clawback claims to pursue through a review of its books and records, including those asserted against the Defendant, Celsius also could have identified the Defendant as a "known" creditor. (*Id.*; *see also id.* at 11 (noting that the Executive made the Defendant's identity known to Celsius in connection with Celsius's separate litigation against the Executive, among others); *id.* (highlighting the subpoena Celsius served on Payward, Inc. in a separate adversary proceeding that sought information concerning wallets containing the Crypto Assets).)

Turning to the individual Counterclaims, the Defendant argues, with respect to Count I, that the doctrine of successor liability forecloses dismissal of Count I at this juncture. (*Id.* at 12 (arguing that CNL's acquisition of the Vehicle either constituted a "*de facto* merger" or Celsius KeyFi was simply a continuation of its predecessor).) Specifically, it is unclear from the record, the Defendant maintains, whether the "transactions were coordinated with the goal of combining . . . [the] respective crypto businesses while avoiding [the Executive's] liabilities to [the Defendant] and others." (*Id.* at 13.) There is "compelling evidence," the Defendant believes, that the Vehicle's liabilities simply became Celsius KeyFi's. (*Id.* at 14.) Regardless, the Defendant argues that he should be permitted to amend the Counterclaims as a matter of right.

(*Id.* at 15 (arguing that the Litigation Administrator would suffer no prejudice if leave to amend were granted and indicating that there was no bad faith made in the request).)

Finally, as to Count II, the Defendant contends that he has sufficiently alleged each element of a claim for unjust enrichment under New York law. Specifically, the Defendant indicates that he has set forth allegations that (i) a benefit was bestowed upon Celsius through the Executive's use of the Crypto Assets and Celsius's retention of the $5 million in profits in connection with the same; (ii) Celsius benefited at the Defendant's expense as the Defendant was deprived of the ability to use the Crypto Assets; and (iii) under New York law, equity and good conscience do not permit Celsius to retain the profits. (*Id.* at 16–18.)

### E. The Reply

In response, the Litigation Administrator maintains that dismissal is appropriate because the Defendant is not a known creditor entitled to actual notice and, in any event, has failed to adequately plead a claim against any Post-Effective Date Debtor. As to the first argument, the Litigation Administrator states that the Defendant has failed to allege that the Executive was acting as an agent for Celsius or within the scope of his agency when he borrowed from the Defendant or that the Defendant's requests for payments were made to the Executive in his capacity as Celsius's agent. (Reply at 3.) Therefore, as corporate entities are not charged with knowledge of all their agent's personal dealings or of information agents learned while acting outside the scope of their authority, the Litigation Administrator believes that the Executive's knowledge of any alleged payment obligations or requests with respect to the loan of Crypto Assets cannot be imputed to Celsius. (*Id.*)

Even if imputed, the Litigation Administrator asserts that knowledge of the Agreement would not have put Celsius on notice that the Defendant would seek to assert a claim against the Post-Effective Date Debtors given the APA's disclaimer of any pre-closing liability. (*Id.* at 4.)

The Defendant's Counterclaims, the Litigation Administrator maintains, also could not have been discoverable from a "reasonably diligent review" of Celsius's books and records. (*Id.* at 5.) Determination of possible fraudulent transfers of funds from Celsius's wallets to the Defendant "would not have indicated," it asserts, "that [the Defendant] had a potential claim against [Celsius] related to a separate loan transfers made to [the Executive] and [the Vehicle]." (*Id.*) Rather, reviewing the Executive and/or the Vehicle's transactions, the Litigation Administrator argues, is the "only way [Celsius] could have possibly surmised that [the Defendant] could be a hypothetical creditor." (*Id.* at 6.) Even so, knowledge of the transactions would not have provided Celsius notice of the purpose of these transfers and what they were pursuant to. (*Id.*) In other words, in the Litigation Administrator's mind, it would not have resulted in notice to Celsius that the Defendant held a claim. (*Id.*)

As to the second argument, the Litigation Administrator states that the Defendant has failed to adequately allege successor liability, including that the *de facto* merger and mere continuation exceptions were satisfied, that would permit Count I to survive dismissal. (*Id.* at 8–9.) Moreover, the Defendant, the Litigation Administrator believes, has also failed to allege how a profit allegedly benefiting the Executive and/or the Vehicle enriched Celsius and in what amount. (*Id.* at 9–10.) Specifically, the Litigation Administrator argues that the Defendant does not allege that (i) any of the profits were ever provided to any Celsius entity; (ii) what portion of the $5 million Celsius (as opposed to the Executive or Vehicle) was enriched; and (iii) how Celsius's purchase of the Vehicle's assets was unjust or at "plaintiff's expense." (*Id.* at 10–11.)

## II.   <u>LEGAL STANDARD</u>

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, also made applicable to adversary proceedings by Rule 7012 of the Federal Rules of

Bankruptcy Procedure, a complaint need only allege "enough facts to state a claim for relief that is ***plausible*** on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (emphasis in original) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A party need only plead "a short and plain statement of the claim" with sufficient factual "heft to sho[w] that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007) (internal quotation marks and citations omitted).  Under this standard, the pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id*. at 555, and present claims that are "plausible on [their] face," *id*. at 570.

"Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Off. Comm. of Unsecured Creditors of Vivaro Corp. v. Leucadia Nat'l Corp. (In re Vivaro Corp.)*, 524 B.R. 536, 547 (Bankr. S.D.N.Y. 2015) (quoting *Iqbal*, 556 U.S. at 678).  Plausibility "is not akin to a probability requirement," but rather requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citations omitted); *see also Twombly*, 550 U.S. at 555 (stating that a pleading that offers "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").  Rather, pleadings "must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556).

Generally, courts use a two-pronged approach when considering a motion to dismiss. *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (stating that motion to dismiss standard "creates a 'two-pronged approach' . . . based on '[t]wo working principles'") (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79)); *McHale v. Citibank, N.A.* (*In re 1031 Tax Grp., LLC*), 420 B.R. 178, 189–90) (Bankr. S.D.N.Y. 2009) (stating that courts use a two-prong approach when considering a motion to dismiss). *First*, a court must accept all factual allegations in the complaint as true, discounting legal conclusions clothed in factual garb. *See, e.g.*, *Iqbal*, 556 U.S. at 677–78; *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory factual allegations in the complaint to be true") (citing *Iqbal*, 556 U.S. at 678). *Second*, a court must determine if these well-pleaded factual allegations state a plausible claim for relief—"a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted). "Dismissal is only warranted where it appears beyond doubt that the plaintiff can prove no sets of facts in support of her claim which would entitle her to relief." *Geron v. Central Park Realty Holding Corp. (In re Nanobeak Biotech Inc.)*, 656 B.R. 350, 361 (Bankr. S.D.N.Y. 2024) (citation omitted).

Courts deciding motions to dismiss must draw all reasonable inferences in favor of the nonmoving party and must limit their review to facts and allegations contained in (i) the complaint; (ii) documents either incorporated into the complaint by reference or attached as exhibits; and (iii) matters of which the court may take judicial notice—such as public records, including complaints filed in state courts. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (citations omitted).

## III.    DISCUSSION

### A. The Defendant is an "Unknown" Creditor, and the Counterclaims Are, Therefore, Barred

Section 1141(d) of the Bankruptcy Code generally provides that confirmation of a plan will discharge a debtor from any debt that arose prepetition irrespective of whether a proof of claim based on such debt was filed, such claim was allowed, or the holder of such claim accepted the plan. 11 U.S.C. § 1141(d)(1). Discharge under the Bankruptcy Code, however, presumes that "all creditors bound by the plan have been given notice sufficient to satisfy due process." *Grant v. U.S. Home Corp. (In re U.S.H. Corp. of N.Y.)*, 223 B.R. 654, 658 (Bankr. S.D.N.Y. 1998). To the extent a "creditor [was] not given reasonable notice of the bankruptcy proceeding and the relevant bar dates, its claim cannot be constitutionally discharged." *Id.*

#### 1.    The Defendant Was Not "Reasonably Ascertainable"

"The proper inquiry in ascertaining whether notice was reasonably given is whether the [noticing party] acted reasonably in selecting means likely to inform persons affected, not whether [a particular party] actually received notice.'" *In re Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.*, 471 B.R. 331, 339 (Bankr. S.D.N.Y. 2012) (quoting *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988)) (alterations in original). Determination whether adequate notice was provided will "depend[] on the facts and circumstances of each case" and hinge on whether a creditor is "known" or "unknown" to the debtor. *U.S.H. Corp. of N.Y.*, 223 B.R. at 658. If a creditor is "known," actual notice of a debtor's bankruptcy filing and bar date is required. *See Chemetron Corp. v. Jones*, 72 F.3d 341, 345 (3d Cir. 1995) (citing *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 296 (1953)); *In re Drexel Burnham Lambert Grp., Inc.*, 151 B.R. 674, 680 (Bankr. S.D.N.Y. 1993) (providing that, for known creditors, adequate notice requires actual written notice of the bankruptcy filing and of the bar date).

14

Where a creditor is "unknown" to the debtor, constructive notice, including publication notice, will generally be sufficient. *Chemetron*, 72 F.3d at 346 (citing *In re Thomson McKinnon Sec., Inc.*, 130 B.R. 717, 719–20 (Bankr. S.D.N.Y. 1991)); *see also Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950) (indicating that constructive notice may be satisfied through publication notice).

Courts will consider a creditor "known" if the identity of such creditor is either "known or 'reasonably ascertainable by the debtor.'" *U.S.H. Corp. of N.Y.*, 223 B.R. at 659 (quoting *Tulsa Professional Collection Serv., Inc. v. Pope*, 485 U.S. 478, 490 (1988)). And whether a creditor's identity is "reasonably ascertainable" will depend on whether such creditor can be "identified through 'reasonably diligent efforts.'" *Id.*; *see Drexel Burnham*, 151 B.R. at 681 (stating that a known creditor would have typically "engaged in some communication with a debtor concerning the existence of the creditor's claim"). Indeed, a "known claim arises from facts that would alert the reasonable debtor to the possibility that a claim might reasonably be filed against it." *Id.* "Reasonably ascertainable," however, is not the same as "reasonably foreseeable," and "[o]nly those claimants who are identifiable through a diligent search" will fall within the former. *Chemetron*, 72 F.3d at 347 (holding that, in substituting the "reasonably foreseeable" test for the "reasonably ascertainable" standard, the bankruptcy court applied the incorrect rule of law).

Conversely, an "unknown" creditor is one whose identity or claim is not "reasonably ascertainable" and is merely "conceivable, conjectural or speculative." *Thomson McKinnon*, 130 B.R. at 720 (citing *Charter Crude Oil Co. v. Petroleos Mexicanos (In re the Charter Co.)*, 125 B.R. 650, 655 (M.D. Fla. 1991); *see Mullane*, 339 U.S. at 317 (noting it was reasonable to "dispense with more certain notice to those [claimants] whose interests are either conjectural or

15

future or, although they could be discovered upon investigation, do not in due course of business

come to knowledge [of the debtor in possession]").

Reasonableness here is also dependent on the facts of each case, and a debtor is not

expected to "notify[] every possible creditor, no matter how speculative their claim might be."

*Charter Co.*, 126 B.R. at 656 (citations omitted); *U.S.H. Corp. of N.Y.*, 223 B.R. at 659; *see also*

*Drexel Burnham*, 151 B.R. at 680 ("Reasonable diligence in ferreting out known creditors will,

of course, vary in different contexts and may depend on the nature of the property interest held

by the debtor.") (citations omitted).  However, while "[a] debtor need not be omnipotent or

clairvoyant . . . [it] is obligated, however, to undertake more than a cursory review of its records

and files to ascertain its known creditors."  *Id.* at 681.  Therefore, "what is required is not a vast,

open-ended investigation" or "[e]fforts beyond a careful examination" of the debtor's own books

and records but rather a "diligent search."  *Chemetron*, 72 F.3d at 346–47.

Accordingly, whether the Defendant's Counterclaims can be discharged pursuant to

section 1141(d)(1) of the Bankruptcy Code turns on whether the Defendant is a "known" versus

"unknown" creditor.  The Court concludes he is the latter.  At the time Celsius filed for

bankruptcy, it was only required to conduct a search of its books and records that was

"reasonable under the circumstances" to reasonably ascertain known creditors; it was not

required to be "omnipotent or clairvoyant."  *Drexel Burnham*, 151 B.R. at 681; *see also In re*

*Motors Liquidation*, 576 B.R. 761, 773 (Bankr. S.D.N.Y. 2017) (noting that debtors do not have

duties to "search out each conceivable or possible creditor and urge that person or entity to make

a claim against it" (quoting *In re Brooks Fashion Stores, Inc.*, 124 B.R. 436, 445 (Bankr.

S.D.N.Y. 1991))).  The Defendant maintains that because Celsius was able to identify alleged

fraudulent transfers made to the Defendant from Celsius's wallets, it should have been aware of

the Defendant's "status as a known creditor."  (Opposition at 10.)  However, knowledge of the

occurrence of such transfers, which serve as the basis for the Complaint, does not necessarily

translate into Celsius's knowledge of the Agreement and the Defendant's potential claims

stemming from it.

As an initial matter and as described in the Amended Answer, not a single Celsius entity

was a party to the Agreement, which serves as the basis for the arrangement between the

Executive and the Vehicle, on the one hand, and the Defendant, on the other.  (*See* Amended

Answer ¶¶ 95–96 (stating that the Agreement, which was memorialized in "various electronic

communications," was entered into on or about September 17, 2020, between the Executive, the

Vehicle, and the Defendant).)  Moreover, section 2.2 of the APA makes clear that the only

liabilities assigned to and assumed by CNL and Celsius KeyFi would be those (i) "related to the

Seller Assets" that (ii) accrue "as of and subsequent to the Closing" and (iii) do not stem from

the Vehicle's breach on or prior to the Closing.  (*See* APA § 2.2(a).)  Specifically, section 2.2

provides:

> (a) On the terms and subject to the conditions set forth in this Agreement, at the
> Closing, the Seller will assign to the Buyer, and the Buyer will assume and be
> responsible solely for, any Liability *related to the Seller Assets that accrue as
> of and subsequent to the Closing, and do not arise from any breach committed
> by the Seller or on its behalf on or prior to the Closing* (the "Assumed
> Liabilities").

> (b) The *Seller will retain and the Buyer will neither assume nor be responsible
> for* (nor be deemed to have assumed or be responsible for) *every other Liability
> of the Seller or related to the Business of any nature* (whether express or
> implied, fixed or contingent, liquidated or unliquidated, known or unknown,
> accrued or due or to become due), which shall not constitute an Assumed
> Liability, including, without limitation, any Liability: (i) unrelated to the Seller
> Assets; (ii) constituting a right or benefit towards the Transferring Persons or
> on their behalf in respect of their employment or engagement with the Seller;
> (iii) for any Taxes arising from the operation of the Business or ownership of
> or rights in the Seller Assets; (iv) arising out of any claim against Seller or the
> Business or otherwise pertaining to the Transferring Persons or the Seller
> Assets pending as of the Closing; (v) arising out of any claim commenced after

> the Closing to the extent that any such claim arises from any act, event or
> omission occurring prior to the Closing; or (vi) ***any other Liability which the
> Seller owes to any third party*** (collectively, the "Excluded Liabilities").

(*Id.* § 2.2 (emphasis added)).  As set forth in subsection (b), all other liabilities remain with the

Vehicle.  (*Id.* § 2.2(b).)  Here, the causes of action for breach of contract and unjust enrichment

likely accrued on December 31, 2020, the Closing Date of the APA and the same day the

transfers of the Crypto Assets were initiated and completed.  (*See* Amended Answer ¶¶ 107–110

(indicating that only the Crypto Assets and not profits were returned on December 31, 2020;

*see, e.g.*, *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) ("A cause of action for breach of

contract ordinarily accrues and the limitations period begins to run upon breach."); *Plitman v.

Leibowitz*, 990 F. Supp. 336, 337 (S.D.N.Y. 1998) ("Under New York law, an unjust enrichment

claim accrues upon occurrence of the wrongful act giving rise to the duty of restitution.").)

The APA defines "Seller Assets" to encompass, among other things, the Vehicle's "right,

title and interest in and to all assets related to the Business," including "[a]ll rights in and to the

contracts set forth in Schedule 2.1(b)" of the APA.  (*Id.* § 2.1.)  However, Schedule 2.1(b) to the

APA, which is executed, does not list what these contracts are and, instead, simply includes a

"note to drafter" to "[p]lease list the Seller Contracts."  (*Id.*, Schedule 2.1(b).)  The Defendant,

nonetheless, concedes that Celsius did not assume the Agreement.  In his Opposition, the

Defendant argues that Celsius is liable on the breach of contract Counterclaim pursuant to a

theory of successor liability based solely on the *de facto* and mere continuation exceptions.  (*See*

Opposition at 12.)  The Defendant does not rely on a successor liability theory predicated on

CNL and Celsius KeyFi's express assumption of the Agreement.  (*See id.* (recognizing that a

buyer's express assumption of the debt can serve as an exception to an acquiring company not

becoming liable for the debts or liabilities of the seller or transferor but indicating that only the

*de facto* and mere continuation exceptions apply).)

18

Given that no Celsius entity was a party to the Agreement, the Defendant agrees that the Agreement was not assumed by a Celsius entity, and section 2.2(b) of the APA makes clear that liabilities not assumed remain with the Vehicle, the Defendant cannot be anything other than an "unknown" creditor. Celsius, as discussed, was not required to search outside of its own books and records to ascertain potential claims, and only a review of agreements between the Executive, the Vehicle, and the Defendant could have possibly put Celsius on notice that the Defendant was a potential creditor. Knowledge of mere transactions between the Executive and the Vehicle, on the one hand, and the Defendant, on the other, would not have, without further investigation, put Celsius on notice as to the nature and context of these transactions, including any possible obligation to pay the Defendant profits generated from the use of the Crypto Assets. "Reasonable diligence does not require 'impracticable and extended services . . . in the name of due process.' . . . A debtor does not have a 'duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it.'" *Motors Liquidation*, 576 B.R. at 773 (citations omitted).

Accordingly, the Court concludes that the Defendant was not "reasonably ascertainable" and is therefore, an "unknown" creditor. Moreover, as an "unknown" creditor, the Court further concludes that publication notice of the Bar Date to the Defendant was sufficient. (*See* Case No. 22-10964, ECF Doc. ## 1435, 1436, 1821 (verifying publication of the Bar Date in The New York Times (National Edition), USA Today, and CoinDesk (CoinDesk.com).)

### 2.    The Executive's Knowledge Cannot Be Imputed to Celsius

The Defendant also argues that it is a "known" creditor since the Executive's knowledge of the Agreement can be imputed to Celsius. The Court is unpersuaded. In general, "[w]hen the principal is a corporation, it is presumptively liable for its agent's actions, and the agent's knowledge is presumptively imputed to the corporation, ***unless the agent acts outside the scope***

19

*of his or her authority*.”  *DGI-BNSF Corp. v. TRT LeaseCo, LLC*, No. 18-CV-3252 (VEC),

2019 WL 5781973, at *5 (S.D.N.Y. Nov. 6, 2019) (emphasis added); *see also Weisfelner v.*

*Hofmann (In re Lyondell Chem. Co.)*, No. 16CV518 (DLC), 2016 WL 5818591, at *3 (S.D.N.Y.

Oct. 5, 2016) (stating that it is a “fundamental principle that the knowledge and actions of a

corporation’s officers and directors, acting within the scope of their authority, is imputed to the

corporation”).  The Defendant has proffered no allegation that the Executive was acting within

the scope of his authority and as an agent of Celsius when he entered into the Agreement and

failed to return profits to the Defendant as allegedly required under the terms of the Agreement.

Therefore, the Court rejects the notion that the Executive’s knowledge of both the Agreement

and the Defendant’s requests for payment of the Crypto Assets and profits generated can be

imputed to Celsius simply by virtue of the Executive’s position as the former Chief Executive

Officer of Celsius KeyFi.  *See Van Ostrand v. Nat’l Life Assur. Co. of Canada*, 371 N.Y.S.2d 51,

51 (N.Y. Sup. Ct. 1975) (“As a general rule, a corporation is not chargeable with knowledge of

all that its agents know, but only with those material facts which the agents have received or

acquired while acting for the corporation within the scope of their agency and where it is their

duty to report their knowledge to the corporation.”).  Rather, it must be the case that the

Executive was acting within the scope of his authority at the time, which the present record does

not support.

### 3.  The Confirmed Plan Requires Dismissal of the Counterclaims

In light of the Court’s conclusion that the Defendant is an “unknown” creditor who

received sufficient notice, the Court finds that the Counterclaims are barred by the confirmed

Plan and the Defendant’s failure to file a proof of claim.  The Court, therefore, need not reach the

individual Counterclaims and related arguments.

### B.  The Defendant's Request for Leave to Amend is Denied

Rule 15(a) of the Federal Rules of Civil Procedure, made applicable by Rule 7015 of the

Federal Rules of Bankruptcy Procedure, generally provides that leave to amend a pleading

should be "freely given when justice so requires."  FED. R. CIV. P. 15(a)(2).  Generally, the

decision whether to allow an amendment is left to the "broad discretion" of the trial court judge.

*See Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000).  "Mere delay . . . absent a showing

of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to

amend."  *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981).  Rather,

"[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a

showing by the nonmovant of prejudice or bad faith."  *Sherman v. Fivesky, LLC*, 19-cv-8015

(LJL), 2020 WL 5105164, at *1 (S.D.N.Y. Aug. 31, 2020) (quoting *Block v. First Blood Assocs.*,

988 F.2d 344, 350 (2d Cir. 1993)).  However, "[a] proposed amendment is . . . deemed futile if

the proposed claim could not withstand a Rule 12(b)(6) motion to dismiss."  *In re Big Apple*

*Volkswagen, LLC*, 571 B.R. 43, 58 (S.D.N.Y. 2017) (quoting *Mason Tenders Dist. Council of*

*Greater N.Y. v. Phase Constr. Servs., Inc.*, 318 F.R.D. 28, 36 (S.D.N.Y. 2016)).

Here, any amendment of the Counterclaims would be futile as such claims are barred by

section 1141(d) discharge and the Defendant's failure to file a proof of claim.  Accordingly, the

Defendant's request for leave to amend is **DENIED**.

## IV.    <u>CONCLUSION</u>

For the reasons discussed, the Motion is **GRANTED**, and the Counterclaims are

**DISMISSED** with prejudice.  The Defendant's request for leave to amend the Counterclaims is

**DENIED**.

**IT IS SO ORDERED.**

Dated:    May 15, 2025
   New York, New York

*Martin Glenn*
_____
MARTIN GLENN
Chief United States Bankruptcy Judge
